IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EMERSON QUIET KOOL CO., LTD,　　　　:
HOME EASY LTD.,　　　　　　　　　　　:
AMERICAN DUCTLESS AC CORP., and　　:
EQK PARTNERS　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　Plaintiffs　　　:　　C.A. NO. 20-1449-LPS
　　　　　　　　　　　　　　　　　　　　:
　　　v.　　　　　　　　　　　　　　　:　　**JURY TRIAL DEMANDED**
　　　　　　　　　　　　　　　　　　　　:
EMERSON ELECTRIC CO.,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　Defendant.　　　:

## **AMENDED COMPLAINT**

Plaintiffs, Emerson Quiet Kool Co. Ltd. ("Quiet Kool"), Home Easy Ltd., ("Home Easy"), American Ductless AC Corp. ("Ductless"), and EQK Partners[1] ("Partnership" or "partnership"), (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this action against Defendant, Emerson Electric Co., and allege as follows:

### **Introduction**

1.　　　As is relevant to this action, Plaintiffs collectively have, or alternatively, one of them individually has the right to enforce and to benefit from an assignment of the trademark, "Emerson Quiet Kool" ("EMERSON QUIET KOOL" or "Trademark") under a "*Trademark Purchase & Sale Agreement*" dated as of January 10, 2017 ("Assignment Agreement", a copy of which is attached hereto as Exhibit "3") between Ductless as "Seller" and assignor on the one hand, and on the other hand, Quiet Kool as "Purchaser" and assignee.

2.　　　The Assignment Agreement, by its terms, sold, assigned, transferred and

---

[1] No responsive pleading has yet been filed to the original Complaint, and therefore EQK Partners and American Ductless AC Corp. are being added as Plaintiffs pursuant to Fed.R.Civ.P. 15(a)(1)(B), as well as the Court's allowance of an Amended Complaint.

1

delivered to the Purchaser, Quiet Kool, the right to use the Trademark in the importing and selling portable, residential, and other home-consumer air conditioner units including, but not limited to, window air conditioners, portable air conditioners, dehumidifiers, ductless air conditioners, and similar products (known collectively as "Home Air Conditioners").

3.　　In addition, as is relevant, the Assignment Agreement stated that "Seller also assigns to Purchaser all consent agreements with third parties, claims, and rights of action, including, but not limited to consents agreements with Emerson Electric Co in 2009 and 2011, claims against third parties for infringement and all royalties, damages or other sums due, that may have arisen in relation to the Trademark before the date of this Agreement."

4.　　In accordance with pleading in the alternative allowed by Fed.R.Civ.P. 8, although the Assignment Agreement names Quiet Kool as the "Purchaser," with the right to enforce the Assignment Agreement, each of the three Plaintiffs were named in this Amended Complaint as a party that, in the alternative, has the right to enforce the Assignment Agreement in recognition of a ruling by this Court in an unrelated action filed under C.A. No.20-1652-LPS, where the Court held that the assignment of the trademark "EMERSON QUIET KOOL" was invalid for lack of consideration.

5.　　However, the Assignment Agreement states it is to be interpreted under New Jersey law, which deprives a stranger to an assignment agreement of standing to attack the validity of the assignment based on lack of consideration if the parties to the agreement do not dispute its validity.[2]

---

[2] *See Malibu Media, LLC v. Tsanko*, No. CIV.A. 12-3899 MAS, 2013 WL 6230482, at *6 (D.N.J. Nov. 30, 2013) (A third-party infringer of a copyright does not have standing to challenge the owner's assignment of the copyright to Plaintiff where there is no dispute between the transferor owner of the copyright and the Plaintiff as transferee.); *See*, *also*, *Oliver v. Bank of Am., N.A.*, No. CIV. 13-CV-4888 RMB, 2014 WL 1429605, at *3 (D.N.J. Apr. 14, 2014); *Giles v. Phelan, Hallinan & Schmieg, LLP*, 901 F. Supp. 2d 509, 532 (D.N.J. 2012) (finding plaintiffs could not challenge the validity of assignments transferring their mortgage from one holder to another).

2

6.      Plaintiffs Quiet Kool, Home Easy, and Ductless share common ownership, and for purposes of this litigation they have pooled their resources to cover the costs and expenses of this case and formed a partnership under Delaware law known as "EQK Partners" which is owned equally by them.

(a)      Each partner shares a common obligation for liabilities as well as the right to share losses and profits.

(b)      Each partner transferred to the partnership whatever rights each had in the Trademark; claims asserted and damages and the relief sought in this litigation; and whatever obligation, and right each had under the Assignment Agreement.

(c)      The partnership agreement provided that the interests of the partners and partnership in this litigation could be expressed by naming each partner as a plaintiff, naming the partnership as a plaintiff, or pleading in the alternative and naming each partner and the partnership as a plaintiff to preserve all claims while the issue of the validity of the Assignment Agreement and other threshold matters are litigated and being determined by the Court.[3]

(d)      The partnership agreement provided further that if the Court allows Quiet Kool to enforce the Assignment Agreement and to be the owner of the Trademark, in consideration for its earlier expenses in this litigation, it has the option and right to buy the interests of the other partners for a refund of their out-of-pocket expenditures plus a premium of

---

[3] The individual partners or the partnership have the right to be named as plaintiffs. *See*, *HB Gen. Corp. v. Manchester Partners, L.P.*, 59 F.3d 1185, 1194-95 (3d Cir. 1996) (Delaware has a "common name" statute, allowing partnerships to sue and be sued in the partnership name, but its use is not mandatory; and the individual partners may sue in their own names as well as in the name of the partnership.) *See*, *also* cited cases, *Furek v. University of Delaware*, 594 A.2d 506, 513 (Del.1991); *see, e.g., Verlaque v. Charles A. Zonko Builder, Inc.*, 1989 WL 112029 (Del. Super. Ct. Sept.11, 1989) (action brought by plaintiff "individually and on behalf" of a partnership).

Here, the partners in EQK Partners and EQK Partners itself were each named as a plaintiff in the alternative pending the resolution of the Court's ruling, if any, on the validity of the Assignment Agreement and perhaps other matters relating to standing and similar issues.

five percent.

(e)     Accordingly, depending on how the issue of the validity of the

Assignment Agreement is resolved in this case:

(i)     Quiet Kool may be permitted by the Court to enforce the

Assignment Agreement, or in the alternative.

(ii)     The rights to the Trademark would default to EQK Partners or one

of the other parties named as Plaintiffs.

(f)     The term "Plaintiffs" as used hereinafter refers to each party among Quiet

Kool, Home Easy, and Ductless that is determined by the Court to have the right to recover all,

or a segment of the relief sought in this action.

## List of Causes of Action in this Amended Complaint

7.      Plaintiffs, and especially Quiet Kool, are in the business of importing and selling

Home Air Conditioners in the United States that are manufactured in China and shipped directly

by boat in cartons and containers to the United States. Defendant devised and implemented a

scheme in the United States that resulted in adverse actions being taken against Plaintiffs in

China; and Defendant used improper means to hinder Plaintiffs' business with the goal of

crushing Plaintiffs, terminating their business as a going concern, and forcing them to abandon

the Trademark. This Amended Complaint pleads causes of action that grow from the facts

alleged below. The Counts allege breach of contract, breach of the implied covenant of good

faith and fair dealing, unfair competition, violation of the Delaware Deceptive Trade Practices

Act, tortious interference with prospective business relations, and unjust enrichment.

## The Parties

8.      Plaintiffs incorporate by reference here the matter alleged in the other numbered

paragraphs of this Amended Complaint and all of the exhibits as though they were set forth at length.

9.      The Plaintiffs are:

(a)      Emerson Quiet Kool Co. Ltd. ("Quiet Kool") is a Delaware corporation that has its principal place of business at 1275 Bloomfield Avenue, Unit 141, Building 16, Fairfield, New Jersey 07004.

(b)      Home Easy Ltd. ("Home Easy") is a Delaware corporation that has its principal place of business at 1275 Bloomfield Avenue, Unit 141, Building 16, Fairfield, New Jersey 07004.

(c)      American Ductless AC Corp. ("Ductless") is a Delaware corporation that has its principal place of business at 378 Route 46, Parsippany, New Jersey 07054.

(d)      EQK Partners ("Partnership" or "partnership") is a partnership formed under the laws of Delaware that is owned equally by its three partners which are the plaintiffs named above in subsections (a)-(c), and its principal place of business at 1275 Bloomfield Avenue, Unit 141, Building 16, Fairfield, New Jersey 07004.

10.      As set forth above in ¶ 6(f), the term "Plaintiffs" refers to each party among Quiet Kool, Home Easy, Ductless and Partnership that is determined by the Court to have the right to recover all, or a segment of the relief sought in this action.

11.      The Defendant, Emerson Electric Co. ("Emerson Electric"), is a Missouri corporation with its principal place of business at 8000 West Florissant Avenue, St. Louis, Missouri 63136.

**Jurisdiction And Venue**

12.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332 because the parties are citizens of different states and the matter in controversy, exclusive of costs, interest, attorneys' fees and expenses, exceeds the sum or value of $75,000.

13.     This Court has personal jurisdiction over Defendant because it regularly conducts business in this District and is engaged in systematic and continuous contacts with this District.

14.     Venue is conferred in accordance with 28 U.S.C. § 1391.

### The 2009 Consent Agreement

15.     The EMERSON QUIET KOOL trademark was registered with the United States Patent and Trademark Office (the "USPTO") in 1979, alleging a first use in commerce in 1949. Airwell North America Hong Kong Technologies Ltd. ("Airwell") acquired the EMERSON QUIET KOOL mark in 2008.

16.     In 2009, Defendant filed a cancellation proceeding with the USPTO alleging abandonment of the EMERSON QUIET KOOL mark. Airwell and Emerson Electric resolved the matter by consent agreement (the "2009 Consent Agreement"). Exhibit 1.

(a)     The 2009 Consent Agreement listed a multitude of products for which Defendant claimed it used its trademark "Emerson", but Home Air Conditioners were not included in the extensive list, thus establishing that Defendant and Airwell did not compete in the Home Air Conditioners market, and therefore, there was no likelihood of confusion.

(b)     Accordingly, as stated in the 2009 Consent Agreement at ¶ 7 the parties were "unaware of any confusion to date arising from the concurrent use of their respective marks on or in connection with their respective goods and/or services", and further, the parties stated they did not "anticipate of any confusion to date arising from the concurrent use of their respective marks, on or in connection with their respective goods and/or services," Airwell consented to the registration of Emerson Electric's marks and Emerson Electric withdrew its

cancellation petition. *Id.*, ¶¶ 7-8, 11.

(c)     Each party looked to the future and agreed to stay out of each's product market in using their trademarks, and consented "not to promote, advertise or distribute its respective goods and/or services in a way that would lead customers to associate it with the other Party or its goods and/or services." *Id.*, ¶ 9

(d)     Moreover, because Defendant did not use the "Emerson" trademark for any products in the market where Airwell was selling its Home Air Conditioners, the 2009 Consent Agreement stated, "[e]ach Party agree[d] not to promote, advertise or distribute its respective goods and/or services in any way that would lead consumersto associate it with the other Party or its goods and/or services." *Id.*, ¶ 9.

(e)     Each party's rights under the 2009 Consent Agreement were expressly permitted by ¶ 13 to be licensed or assigned without the need to notify or obtain permission from the other party.

### The 2011 Consent Agreement

17.     In 2010, Airwell filed an application to register the EMERSON QUIET KOOL mark for "*portable compact residential and wall room air conditioning units*" (the "Airwell Goods", emphasis added). After the USPTO cited certain of Defendant's marks as bars to the registration of Airwell's application, Airwell and Defendant entered into a second consent agreement (the "2011 Consent Agreement"). Exhibit 2.

(a)     In contrast to the air conditioners that defined the Airwell Goods, the 2011 Consent Agreement described Defendant's products as "compressors for use in refrigeration" and "AC and DC adjustable speed drives for commercial and industrial use", thus establishing that Defendant and Airwell did not compete in the Home Air Conditioners market, and therefore,

there was no likelihood of confusion. *Id.*, ¶ 2.

(b)     The 2011 Consent Agreement emphasized that it was the fact that Defendant did not sell Home Air Conditioners that eliminated the risk of confusion, and at ¶ 5.a, the 2011 Consent Agreement referenced "the differences between the distinct goods and/or services", and at ¶ 5.b it stated:

> "The Airwell Goods [i.e., *portable compact residential and wall room air conditioning units*] and Emerson's respective goods and/or services are sufficiently different when used in connection with the respective marks."

(c)     Because the parties did not "anticipate any confusion arising from the concurrentuse of their respective marks, on or in connection with their respective goods and/or services," Emerson Electric consented to the registration of the EMERSON QUIET KOOL mark (referred to as the "Airwell Mark" in the 2011 Consent Agreement). *Id.*, ¶ 4.

(d)     Because Defendant did not use the "Emerson" trademark for any Home Air Conditioners, the 2011 Consent Agreement stated, "*[e]ach Party agree[d] not to promote, advertise or distribute its respective goods and/or services in any way that would lead consumers to associate it with the other Party or its goods and/or Services.*" *Id.*, ¶ 6 (emphasis added).

(e)     Each party's rights under the 2011 Consent Agreement were expressly permitted by ¶ 13 to be licensed or assigned without the need to notify or obtain permission from the other party.

### The Assignment of the Trademark to Quiet Kool

18.     Ductless obtained ownership of the Trademark in 2014, and assigned the Trademark to Quiet Kool in 2017. Quiet Kool has authorized Home Easy to use the EMERSON QUIET KOOL marks. As noted, Ductless, Quiet Kool and Home Easy have the same owner and are in the Home Air Conditioners business.

19.     The following chart shows the assignment history of the EMERSON QUIET

KOOL marks and goodwill.

| Assignor | Assignee | Date Recorded | Type |
|---|---|---|---|
| National Union Electric Corp. | Emerson Quiet Kool Corp. | 11/4/1983 | Assigns the Entire Interest and the Goodwill |
| Emerson Quiet Kool Corp. | Jepson Corporation | 4/30/1990 | Merger |
| Jepson Corporation | Falcon Manufacturing Inc. | 9/27/1991 | Name Change |
| Falcon Manufacturing Inc. | Fedders North America | 9/27/1991 | Assigns the Entire Interest and the Goodwill |
| Fedders North America | Airwell Hong Kong Technologies Limited | 7/8/2008 | Assigns the Entire Interest and the Goodwill |
| Fedders Hong Co. Ltd. (f/k/a Airwell Hong Kong Technologies Limited) (Registration No. 4,688,893) | Elco Holland BV | 12/14/2012 | Assigns the Entire Interest and the Goodwill |
| Elco Holland BV | American Ductless AC Corp | 10/21/2014 | Assigns the Entire Interest and the Goodwill |
| American Ductless AC Corp | Emerson Quiet Kool Ltd | 2/6/2017 | Assigns the Entire Interest and the Goodwill |

**Defendant's "Scheme" to Drive Quiet Kool Out of Business That Was Devised in,
and Directed from the United States, and Implemented in China**

20.     Plaintiffs' allegations in this section concerning Defendant's malicious corporate

strategy and its tortious, anticompetitive acts and scheme (known collectively as the

"Scheme") are based on observation as well as information and belief derived from Plaintiffs'

9

knowledge of the Home Air Conditioners market and industry; logic and likelihood of events; research of documents available online and to the public; and the responses to inquiries made to knowledgeable people, including reliable participants in the Chinese consumer market for Home Air Conditioners, manufacturing, shipping and Chinese regulation of businesses. Plaintiffs expect to supplement their knowledge base and prove the material allegations in this Amended Complaint during discovery.

21.     Defendant devised and directed through its executives and managers located in the United States for the purpose of driving Quiet Kool out of the business of importing and selling portable, residential, and other home-consumer air conditioner units.

22.     The Scheme involved the manipulation, misleading, and abuse of local governmental units in China, coupled with the artifice of registering in China the exact Trademark that had been used exclusively by Plaintiffs in the United States pursuant to an agreement with Defendant, not for the purpose of branding of Home Air Conditioners made or sold by Defendant, but solely to hinder and hamper Plaintiffs and stop Emerson Quiet Kool Co. Ltd from being able to sell and deliver Home Air Conditioners in the United States.

(a)     After executing the 2011 Consent Agreement, Defendant misappropriated the EMERSON QUIET KOOL mark by registering various EMERSON QUIET KOOL trademarks in China.

(b)     On information and belief derived in part from inquires and investigation of the Home Air Conditioners offered for sale to consumers in China, Defendant did not seriously or as part of its regular product line intend or attempt to offer for sale to consumers in China any products in the Home Air Conditioners category under the Trademark, nor did Defendant establish any market share or brand loyalty associated with the Trademark for

Home Air Conditioners among customers in China; and Defendant had established no goodwill in the Trademark for Home Air Conditioners or other products prior to, or after, it registered the Trademark that would or could result in confusion about the source in China of products bearing the Trademark.[4]

23.     Without any sales in the ordinary course of business (as opposed to faking a record to fool the trademark registration authorities in China) or intent to sell Home Air Conditioners to Chinese consumers in the near future under the Trademark that it registered in China, Defendant through its executives and managers located in the United States, concocted the Scheme to weaponize its registration of the Trademark in China for the purpose of injuring Quiet Kool; and acting from Defendant's base in Missouri or elsewhere in the United States as

---

[4] It is recognized that a Complaint is not the place to present evidence or argument. However, because modern pleading is subject to the Supreme Court's *Twombly/Iqbal* pleading standards' "plausibility" requirement, the following is designed to help bring forth sufficient factual allegations that nudge a claim across the line from conceivable to plausible in that it demonstrates why Defendant did not, and would not expect to sell Home Air Conditioners in China under the Trademark. For example, Defendant has a website for its company covering its products sold in China at https://www.emerson.cn/en-cn and it has general websites for its business and products in China https://www.emerson.cn/en-cn/commercial-residential-solutions. Neither of these websites nor extensive Google searches (*see, e.g.,* https://www.google.com/search?q=emerson+china&rlz=1C1XITZ_enUS916US916&oq=emerson+china&aqs=chrome..69i57j0i512j46i512j0i22i30l7.5607j0j4&sourceid=chrome&ie=UTF-8) show any use in China by Defendant of the Trademark or even the promotion of Home Air Conditioners in China. *See also*, https://climate.emerson.com/en-sg/products/air-conditioning-products?_gl=1*1bmgn10*_ga*MTkwNDk0MTU5LjE2NDA4MTA2Njk.*_ga_1MGRRDNV9H*MTY0MDg1NzgzOS4yLjEuMTY0MDg1NzkyMC4w*_ga_SLC7NHXH7Q*MTY0MDg1NzgzOS4yLjEuMTY0MDg1NzkyMC4w

Furthermore, Defendant is not mentioned in any discussion of suppliers of Home Air Conditioners to Chinese consumers (*see, e.g.,* http://www.whatchina.cn/air-conditioning-brands.html); and based on the literature, no reasonable company would attempt to sell any product in China under the brand name, "Emerson Quiet Kool". *See*, "*Why Do Foreign Brand Names Have To Be Translated Into Chinese?*" https://www.luxurysociety.com/en/articles/2018/01/why-do-foreign-brand-names-have-be-translated-chinese, ("If you want to promote your brand in China, a Chinese brand name is a MUST." And "[T]he average Chinese person tends to not be familiar with even the simplest English words…Chinese characters are not alphabets made up of consonants and vowels, as is the case in other languages like Japanese and Korean. Each character has an independent sound and meaning. (That's why an English translation takes up about three times as much space as its Chinese version.) Therefore, only proper nouns such as names of people or cities are phonetically translated with a few exceptions. All other English words like mobile phone, sexy, kiss, tire, monitor, server, etc. are all translated based on meaning.") In short, the facts indicate there would be no value for Defendant to use the Trademark in China.

aforesaid, Defendant furthered the Scheme as follows:

(a)     Defendant caused a report to be filed with local governmental agencies in China asserting falsely that the units of Home Air Conditioners that Chinese factories had manufactured for Quiet Kool and had put in boxes, crates and containers in anticipation of direct shipment to the United States (without any of the units being offered for sale anywhere else but the United States) violated Defendant's rights under the Chinese trademark registration, and would cause confusion to Chinese consumers seeking Home Air Conditioners made by Defendant.

(b)     Defendant appears to have created false evidence when trying to enforce its registration in that it relied on paper-like stickers with the Trademark printed on them that were glued to things not offered for sale to consumers in the ordinary course of business to prove that Defendant had used the Trademark; and because Defendant did not have a basis for the registration, its purpose was to harm Plaintiffs.

(c)     Defendant exploited wrongfully the improper trademark registrations by causing a complaint to be filed with the Zhongshan Customs Office in the Port of Zhongshan in May 2018, and Defendant otherwise exhorted the governmental units in China to take action against Quiet Kool and its Home Air Conditioners units in China; Defendant directed that a legal complaint and action be filed with the Zhongshan Customs Office in the Port of Zhongshan in May 2018 and to falsely bolster the fiction that Defendant's legitimate trademark rights were being infringed, Defendant directed that stickers with the Trademark be affixed to products solely for the purpose of supporting the false claim to the governmental agencies in China that Quiet Kool's boxed and ready-to-ship air conditioners sitting at ports in China were infringing Defendant's registered trademark

(d)     Defendant provoked the result that the Port of Zhongshan detained Quiet Kool's goods; specifically, over 600 window air conditioning units worth approximately $1.2 million. Those air conditioning units, which represent approximately $300,000 in damages to Quiet Kool, remain at the Port of Zhongshan today; and since May 2018, Quiet Kool has been unable to export any of its Home Air Conditioners from the Port of Zhongshan to customers in the United States.

(e)     Although Quiet Kool never sold any products under the Trademark in China and had not engaged in any activity that could have possibly infringed Defendant's use of its registered Trademark in China or diminished its value in China (assuming *arguendo* Defendant's registration of the Trademark was not fraudulent or otherwise invalid), Defendant exhorted the governmental units in China to take action against Quiet Kool and its Home Air Conditioners units in China, and Defendant directed from the United States that its agents in China report falsely to governmental agencies in China that Quiet Kool's boxed and ready-to-ship air conditioners sitting at ports in China were infringing Defendant's registered trademark.

(f)     In 2018, Defendant commenced a legal action in the Chinese Court system seeking to prevent Quiet Kool from manufacturing its products in China. In the litigation, Defendant offered what appeared to be manufactured and false evidence of use of the Trademark, but what it actually showed was that it had glued on paper-like stickers with the words "EMERSON QUIET KOOL" to random Emerson Electric products that were unrelated to Home Air Conditioners, and where the sticker seemed unrelated and inappropriate to the products, thus casting doubt on the legitimacy of Defendant's argument

(g)     As the intended result of Defendant's lawsuit in China, Midea, the Chinese company that manufactured the Home Air Conditioners for Quiet Kool refused to make

any further products for Quiet Kool. Moreover, Gree, one of the largest manufacturers of air conditioners in China, also cited the lawsuit as grounds to refuse to produce Home Air Conditioners for Quiet Kool – and many other Chinese manufacturers have also refused.

        (h)     Another intended result the lawsuit Defendant directed be filed and financed from in the United States, is that because the shipment of Quiet Kool's Home Air Conditioners was detained in the Port of Zhongshan, it was never delivered to Quiet Kool's customer, New York Appliances, a major distributor of Quiet Kool's Home Air Conditioners; and consequently, Quiet Kool breached its 2018 and 2019 purchase orders with New York Appliances. Thereafter, New York Appliances significantly reduced its business with Quiet Kool. A similar pattern of dropping or minimizing Quiet Kool as a supplier of Home Air Conditioners has been followed by Walmart, Home Depot and other former customers of Quiet Kool.

        24.    Based on Defendant's misleading assertions formulated in the United States as part of the Scheme that were communicated to the governmental agencies in China that controlled the docks from which Plaintiffs' products were to be shipped, the Scheme improperly caused the shipment of Plaintiffs' products waiting to be loaded on vessels headed for the United States to be seized for violation of Defendant's Chinese trademark registration despite Defendant having had no valid grounds or legitimate business interest to cause the seizure.

        25.    On information and belief derived from inquires made, Defendant's actions that occurred in the United States at Defendant's offices and outposts included its executives and managers conceiving the Scheme and directing Defendant's agents in China to do what was needed to cause Plaintiffs' Home Air Conditioners to be seized from the docks before they

could be loaded on vessels and transported to the United States; and Defendant knew that its actions in conceiving, furthering and implementing the Scheme were tortious, intentional and not in pursuit of any legitimate business purpose in that:

(a)    Defendant knew Quiet Kool did not sell its products in China, and that its only link it had with China was that Quiet Kool contracted with factories there to manufacture air conditioners that were immediately packed in crates, boxes and containers at the factories for shipment to the United States by boat.

(b)    Defendant was not in the business of actually selling air conditioners in China under the Trademark and had established no market, brand recognition or goodwill associated with the Trademark for Home Air Conditioners or any other product under the Trademark in China with consumers of Home Air Conditioners.

(c)    The air conditioner products made in China for Quiet Kool did not compete with any of Defendant's products sold in China that used the Trademark; and no consumer in China would even know about the existence of the crates, boxes and products packed for shipping containing the Home Air Conditioners that Chinese factories had made for Quiet Kool because they were never previously, and were not about to be, offered for sale anywhere except the United States.

(d)    There was no legitimate business or other reason for Defendant to cause the Chinese governmental units to seize the Home Air Conditioners that were about to be shipped to the United States because there was zero opportunity for confusion by anyone about either party's products.

26.    The motivation for Defendant's Scheme, based on Plaintiffs' observations and information and belief, is that as Plaintiffs' business grows, there will be more products in the

stream of commerce bearing the word "Emerson" from Plaintiffs' sales, and Defendant would have no control over how Plaintiffs used the Trademark. This likelihood of loss of control could be remedied only by crushing Quiet Kool; and after its demise, Defendant could then argue the mark "EMERSON QUIET KOOL" was abandoned, and Defendant could acquire it as a step in its program to have complete control over any use of the word "Emerson" found in a trademark.

27.     Defendant's Scheme was a success, and as noted above, customers in the United States that planned to purchase Quiet Kool's Home Air Conditioners did not receive delivery; and not only did Quiet Kool lose the income from the sales to these customers in the United State, it lost also future sales to these American customers; and American consumers lost the opportunity to buy Quiet Kool's quality products in the United States.

28.     In addition, the Scheme caused further injury because the contract manufacturers in China that made the products for Quiet Kool did not want to have problems with the governmental units in China that Defendant caused to hinder Quiet Kool and the manufacturers, thus curtailed or refused to continue to manufacture the products ordered by Quiet Kool. As a result, Quiet Kool lost sales and customers in the United States that demanded quantities Quiet Kool could no longer obtain.

29.     Defendant's registering the Trademark in China and its publicizing its registration has injured and undermined the value of Plaintiffs' Trademark in the United States and wherever else Plaintiffs' Trademark is recognized.

(a)     Strategic partners, venders and customers at the manufacturing, shipping, Marketing, and selling level with knowledge of registration and acts of Defendant to enforce it have doubts about Plaintiffs rights to use the valuable Trademark, and are confused about the

origin of Home Air Conditioners with the Trademark.

(b)     Defendant's registration of the EMERSON QUIET KOOL mark, and other actions in support of the Scheme caused confusion in the marketplace, amongst consumers, retailers, and distributors of Home Air Conditioners.

30.     Defendant's wrongful registration and acts have locked Quiet Kool and/or Plaintiffs out of the Chinese market and breached the 2011 Consent Agreement where Defendant acknowledged it had not in the past used the Trademark for any Home Air Conditioners, and Defendant agreed that it would not "*promote, advertise or distribute its respective goods and/or services in any way that would lead consumers to associate it with the other Party or its goods and/or Services.*" Exhibit 2, ¶ 6 (emphasis added).

## COUNT I

### (BREACH OF CONTRACT)

31.     Plaintiffs reallege and incorporate by reference all of the other paragraphs in this Amended Complaint as if set forth fully herein.

32.     The 2011 Consent Agreement is a valid and binding contract.

33.     Defendant consented to Plaintiffs' registration of the EMERSON QUIET KOOL mark and use of the EMERSON QUIET KOOL mark in connection with "portable compact residential and wall room air conditioning units."

34.     Defendant also agreed in the 2011 Consent Agreement "not to promote, advertise or distribute its respective goods and/or services in any way that would lead consumers to associate it with the other Party or its goods and/or services."

35.     Defendant breached the 2011 Consent Agreement by registering the EMERSON QUIET KOOL in connection with "portable compact residential and wall room air conditioning

17

units" and by designing and implementing the Scheme.

36.     In the alternative and the hypothetical, if Defendant sold Home Air Conditioners products under the Trademark, Defendant breached the 2011 Consent Agreement by marking its Home Air Conditioners with the EMERSON QUIET KOOL marks and promoting, advertising, and distributing them.

37.     Defendant's actions were a repudiation of its promises under the 211 Consent Agreement and a breach of contract that caused Plaintiffs damages that were not reasonably mitigatable.

38.     As a direct and proximate result of Defendant's breach of the 2011 Consent Agreement, Plaintiffs have suffered and will continue to suffer significant harm.

39.     Solely as a direct and proximate result of Defendant's said breach, Plaintiffs were caused to suffer losses and damages in excess of $75,000 that are still growing and are likely to continue to grow in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant in an amount in excess of $75,000, plus costs, interest and whatever other relief is just and appropriate and allowed by the Court.

## COUNT II

### (BREACH OF THE IMPLIED COVENANTOF GOOD FAITH AND FAIR DEALING)

40.     Plaintiffs reallege and incorporate by reference all of the other paragraphs in this Amended Complaint as if set forth more fully herein.

41.     Delaware law implies a covenant of good faith and fair dealing in all contracts.

42.     The implied covenant of good faith and fair dealing requires that Defendant refrain from arbitrary or unreasonable conduct that has the effect of preventing Plaintiffs from

receiving the benefit of its bargain.

43.     Defendant breached the implied covenant of good faith and fair dealing in connection with the 2011 Consent Agreement by the actions it took in designing, directing and causing the implementation of the Scheme and other wrongful acts, as alleged above.

44.     In the alternative and the hypothetical, if Defendant sold Home Air Conditioners products under the Trademark, Defendant further breached the implied covenant of good faith and fair dealing inconnection with the 2011 Consent Agreement by marking its goods and products with the EMERSON QUIET KOOL marks in promoting, advertising, and distributing its goods in China.

45.     As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered and will continue to suffer significant harm.

46.     Solely as a direct and proximate result of Defendant's said breach, Plaintiffs were caused to suffer losses and damages in excess of $75,000 that are still growing and are likely to continue to grow in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant in an amount in excess of $75,000, plus costs, interest and whatever other relief is just and appropriate and allowed by the Court.

## COUNT III

### (UNFAIR COMPETITION)

47.     Plaintiffs reallege and incorporate by reference all of the other paragraphs in this Amended Complaint as if set forth more fully herein.

48.     Plaintiffs have a reasonable expectancy of entering a valid business relationship with Midea, Gree, and other Chinese manufacturers of air conditioners as well as product

designers, marketers, shippers, and other entities and people who would assist and enable Plaintiffs to increase its revenue and profits.

49.     Plaintiffs have a reasonable expectancy of entering a valid business relationship with New York Appliances, Home Depot, Walmart, and other customers.

50.     Plaintiffs have reasonable expectancy that it would be able to have business relationships with the entities and people (known collectively as "Product Participants") involved in the sourcing, creation, refinement, manufacturing, marketing, promoting, and transporting of Home Air Conditioners in China and shipping them from China to the United States for marketing and sale, but as a result of Defendant's said wrongful acts, including the designing, implementing and directing the Scheme, Plaintiffs' expectations were frustrated, thwarted, interfered with and defeated in that:

        (a)     Product Participants refused to do business with Plaintiffs as a result of the Scheme;

        (b)     Plaintiffs could not obtain the support, advice, services and contributions from Product Participants which curtailed and had a negative impact on Plaintiffs' sustainability, profits and growth; and

        (c)     Plaintiffs could not meet the demands of its customers and lost their business as well as had sales and future sales injured.

51.     Plaintiffs and Defendant are competitors in the use of the name "Emerson" as part of a trademark for products, and Defendant engaged in unfair competition to exert control and drive Plaintiffs out of business so Defendant could obtain the Trademark.

52.     By Defendant's actions that it took in designing, directing and causing the implementation of the Scheme and other wrongful acts, as alleged above, Defendant wrongfully

interfered with Plaintiffs' expectancy that it would enter into manufacturing arrangements and agreements with Midea, Gree and other manufacturers as well as product designers, marketers, shippers, and other entities and people who would assist and enable Plaintiffs to increase its revenue and profits.

53.     By Defendant's actions that it took in designing, directing and causing the implementation of the Scheme and other wrongful acts, as alleged above, Defendant wrongfully interfered with Plaintiffs' expectancy that it would enter into purchase orders with New York Appliances, Home Depot. Walmart. and other customers.

54.     In addition, Defendant's wrongful acts defeated Plaintiffs' legitimate expectations for relationships that would lead to profits and growth and interfered with them wrongfully.

55.     Moreover, Defendant's design and implementation of the scheme was for the purpose of ruining Plaintiffs, driving Plaintiffs out of business, forcing Plaintiffs to abandon the Trademark, and depriving Plaintiffs with the means to survive as a business entity.

56.     Defendant caused harm to Plaintiffs and competed unfairly and hurt Plaintiffs' commercial relations because by designing and directing and perpetrating the Scheme, Defendant engaged in deceptive marketing, instituted groundless litigation and claims, maintained an unlawful restraint of trade, interfered with Plaintiffs' relations with its customers, suppliers and strategic partners, infringed Plaintiffs' rights in the Trademark provided by the Consent Agreement of 2011, and engaged in efforts to maliciously drive Plaintiffs out of business and to eliminate Plaintiffs as a competitor for the use of a mark that includes the name "Emerson" due to Defendant's plan to control all use of the name "Emerson" in connection with products in commerce.

57.     As a direct and proximate result of Defendant's wrongful acts, Plaintiffs have

suffered and continue to suffer significant harm and irreparable injury.

58.     Defendant's said wrongful acts were willful, wanton, intentional, malicious and undertaken with reckless disregard for the rights of Plaintiffs, and Plaintiffs are entitled to an award of punitive or exemplary damages

59.     Solely as a direct and proximate result of Defendant's said breach, Plaintiffs were caused to suffer losses and damages in excess of $75,000 that are still growing and are likely to continue to grow in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant in an amount in excess of $75,000, plus costs, interest, punitive damages, and whatever other relief is just and appropriate and allowed by the Court.

## COUNT IV

### (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS)

60.     Plaintiffs reallege and incorporate by reference all of the other paragraphs in this Amended Complaint as if set forth more fully herein.

61.     Quiet Kool had a reasonable probability of further business opportunities with Midea, Gree and other Chinese manufacturers of air conditioners for continued and future opportunities and contracts for them to manufacture Home Air Conditioners under the Trademark for Plaintiffs in China and elsewhere.

62.     Defendant's design, direction and implementation of the Scheme wrongfully and intentionally interfered with Plaintiffs' ability to continue to do business with these entities; and Plaintiffs lost opportunities to enter into further manufacturing orders with them.

63.     Plaintiffs have a reasonable probability of further business opportunities with its said customers and prospective customers for ultimate sales of Home Air Conditioners with the

Trademark in the United States.

64.     By Defendant's actions that it took in designing, directing, and causing the implementation of the Scheme and other wrongful acts, as alleged above, wrongfully interfered with Plaintiffs' contracts, potential contacts, business relationships, and likely relationships.

65.     Defendant's said wrongful actions reduced substantially or eliminated Plaintiffs' ability to work with and have the benefits provided by contractual and business relationships with Product Participants.

67.     Defendant's said wrongful actions impaired Plaintiffs' ability to obtain the sourcing, creation, refinement, manufacturing, marketing, promoting, and transporting of Home Air Conditioners in China as well as the shipping of them from China to the United States that was necessary for Plaintiffs to sustain its business and earn a profit, and for marketing and sales.

68.     As a result of Defendant's said wrongful acts, including the designing, implementing and directing the Scheme, Plaintiffs' relationships with the Product Participants were frustrated, thwarted, interfered with and defeated, as aforesaid.

69.     Defendant's said wrongful acts maliciously, tortiously, recklessly and intentionally interfered with Plaintiffs' opportunities to enter into further purchase orders with its said customers and other others that would have been likely customers.

70.     Defendant's said wrongful acts were willful, wanton, intentional, malicious and undertaken with reckless disregard for the rights of Plaintiffs, and Plaintiffs are entitled to an award of punitive or exemplary damages

71.     Solely as a direct and proximate result of Defendant's said breach, Plaintiffs were caused to suffer losses and damages in excess of $75,000 that are still growing and are likely to continue to grow in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant in an amount in excess of $75,000, plus costs, interest, punitive damages, and whatever other relief is just and appropriate and allowed by the Court.

## COUNT V

### (TORTIOUS INTERFERENCE WITH CONTRACT)

72.     Plaintiffs reallege and incorporate by reference all of the other paragraphs in this Amended Complaint as if set forth more fully herein.

73.     Defendant knew of Plaintiffs' contracts and purchase orders with retailers in the United States, including the customers previously named.

74.     By Defendant's intentional, willful, wrongful actions that it took in designing, directing and causing the implementation of the Scheme and other wrongful acts, as alleged above, Defendant caused Plaintiffs to be unable to fulfill its contractual obligations, as aforesaid.

75.     As a result of Defendant's knowing and intentional actions, Plaintiffs breached its purchase orders in 2018 and 2019 with New York Appliances; and Defendant knowingly and intentionally caused Plaintiffs' contracts with its other customers and suppliers to be breached by Plaintiffs or by the other contracting party that was reacting to and seeking to avoid harmful consequences it would suffer as a result of Defendant's actions.

76.     As a result of Defendant's said wrongful acts, including the designing, implementing and directing the Scheme, Plaintiffs' relationships and contracts with its said contracting parties were frustrated, thwarted, interfered with and breached, as aforesaid; and Plaintiffs suffered loss of profits and growth, and other economic and financial damages

77.     Defendant's said wrongful acts maliciously, tortiously, recklessly and intentionally interfered with Plaintiffs' contracts and relationships with contracting parties.

24

78.     Defendant's said wrongful acts were willful, wanton, intentional, malicious and undertaken with reckless disregard for the rights of Plaintiffs, and Plaintiffs are entitled to an award of punitive or exemplary damages

79.     Solely as a direct and proximate result of Defendant's said wrongful acts, Plaintiffs were caused to suffer losses and damages in excess of $75,000 that are still growing and are likely to continue to grow in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant in an amount in excess of $75,000, plus costs, interest, punitive damages, and whatever other relief is just and appropriate and allowed by the Court.

## COUNT VI

## (VIOLATION OF DELAWARE DECEPTIVE TRADE PRACTICES ACT)

80.     Plaintiffs reallege and incorporate by reference all of the other paragraphs in this Amended Complaint as if set forth more fully herein.

81.     The Delaware Uniform Deceptive Trade Practices Act, 6 Del. C. 2532 (the "Act") addresses unfair and deceptive trade practices that interfere with the promotion and conduct of another's business.

82.     In the alternative and the hypothetical, if Defendant sold Home Air Conditioners products under the Trademark, Defendant's registration and use of the EMERSON QUIET KOOL marks caused and is causing confusion, mistake or deception as to the source, origin, sponsorship or approval of the products Defendant sells in that consumers and others are likely to incorrectly believe Quiet Kool authorizes or controls the sale of those products or that Defendant is associated withor related to Quiet Kool.

(a)     Defendant's registration and use of the EMERSON QUIET KOOL marks

is causing confusion or of misunderstanding as to affiliation, connection, or association of the products Defendant sells in that consumers and others are likely to incorrectly believe Emerson Quiet Kool authorizes or controls the sale of those products or that Defendant is associated with or related to Quiet Kool.

(b)     Defendant's registration and use of the EMERSON QUIET Kool marks is a deliberate, intentional and willful attempt to injure Quiet Kool's business, to trade onQuiet Kool's good will and to confuse and deceive consumers.

83.     As a direct and proximate result of Defendant's actions, Plaintiffs have suffered and will continue to suffer significant harm. Plaintiffs' remedies at law are inadequate to compensate for this harm and damage and Plaintiffs need injunctive relief to stop Defendant from its wrongful acts and to prevent their consequences.

WHEREFORE, Plaintiffs request the Court enjoin Defendant from using the Trademark and provide whatever other relief is just and appropriate and allowed by the Court.

## COUNT VII

### (In the alternative: UNJUST  ENRICHMENT)

84.     Plaintiffs reallege and incorporate by reference all of the other paragraphs in this Amended Complaint as if set forth more fully herein.

85.     Alternatively, Defendant's wrongful conduct against Plaintiffs constitute unjust enrichment.

86.     Defendant has been unjustly enriched by destroying a competitor in the United States, and capturing Plaintiffs' lost sales and lost profits.

87.     Defendant's unjust enrichment is directly related to and is causing Plaintiffs' impoverishment.

26

88.     There is no justification for Defendant's unjust enrichment and Plaintiffs'
resulting impoverishment.

89.     Plaintiffs' remedies at law are inadequate to compensate for this harm  and loss.

WHEREFORE, Plaintiffs demand judgment in an amount in excess of $75,000 plus
costs, interest, and whatever other relief is just and appropriate and allowed by the Court.

**SIDKOFF, PINCUS & GREEN, P.C.**

Gary Green
Larry M. Keller
1101 Market Street, Suite 2700
Philadelphia, PA 19107
(215) 574-0600
gg@sidkoffpincusgreen.com
lmk@sidkoffpincusgreen.com

*Attorney for Plaintiffs,*
*Emerson Quiet Kool,  LTD. Home Easy,*
*LTD, American Ductless AC Corp and*
*EQK Partners*

**BARNES & THORNBURG, LLP**

*/s/ Thomas E. Hanson, Jr.*
Thomas E. Hanson, Jr.
1000 North West Street, Suite 1500
Wilmington, DE 19801-1050
(302) 300-3447
thanson@btlaw.com

*Attorney for Plaintiffs, Emerson Quiet*
*Kool Co., LTD, Home Easy, LTD,*
*American Ductless AC Corp., and EQK*
*Partners*

Dated:  December 30, 2021

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas E. Hanson, Jr., hereby certify that on December 30, 2021, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

*Adam W. Poff, Esquire*
*Robert M. Vrana, Esquire*
*Rodney Square*
*1000 North King Street*
*Wilmington, DE  19801*
*(302) 571-6600*
*apoff@ycst.com*
*rvrana@ycst.com*
*Attorneys for Defendant*

**BARNES & THORNBURG, LLP**

*/s/ Thomas E. Hanson, Jr.*
Thomas E. Hanson, Jr.
1000 North West Street, Suite 1500
Wilmington, DE 19801-1050
(302) 300-3447
thanson@btlaw.com
*Attorney for Plaintiffs Emerson*
*Quiet Kool,Ltd. Home Easy, Ltd.*
*American Ductless AC Corp and*
*EQK Partners*